# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Joseph Salem, *et al*.,

                Plaintiffs,

      -vs-

City of Akron, *et al.,*

                Defendants

Case No.  5:18cv1754

JUDGE PAMELA A. BARKER

AMENDED MEMORANDUM OPINION
AND ORDER

Currently pending is the Motion for Summary Judgment of Defendants City of Akron, Terry Pasko, Chris Brewer, Eric McDonald, Michael Pasternak, Adam Guilmette, Brett Talcott and Kevin Rybka.  (Doc. No. 30.)  Plaintiffs Joseph Salem and The Spot for Entertainment, LLC dba Hibachi Xpress Bar and Grille filed a Brief in Opposition, to which Defendants responded.  (Doc. Nos. 36, 38.)   For the following reasons, Defendants' Motion for Summary Judgment (Doc. No. 30) is GRANTED as to Plaintiffs' unlawful entry claim (Count III) brought under 42 U.S.C. § 1983. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and remands those claims to the Summit County Court of Common Pleas.

## I.      Procedural History

On June 25, 2018, Plaintiffs Joseph Salem and The Spot for Entertainment, LLC dba Hibachi Xpress Bar and Grille (hereinafter referred to collectively as "Plaintiffs") filed a Complaint in the Summit County Court of Common Pleas against the following Defendants:  (1) the City of Akron; (2) Akron Police Captain Terry Pasko;[1] (3) Major Paul Calvaruso; (4) Captain Christopher Brewer;

---

[1] In the Complaint, this Defendant's last name is spelled "Pasco."  However, in an Affidavit submitted in support of Defendants' summary judgment motion, this Defendant spells his name "Pasko."  (Doc. No. 30-1.)  The Court will refer to this Defendant consistent with his affidavit, i.e., as Terry Pasko.

(5) Officer Eric McDonald; (6) Officer Michael Pasternak; (7) Officer Adam Guilmette; (8) Officer Brett Talcott; (9) Officer Kevin Rybka; (10) Lieutenant Stephen Phillips; and (11) Akron Police Officers John Does 1-12. [2] (Doc. No. 1-1.) Plaintiffs assert claims for unlawful entry; assault and battery; false arrest; abuse of process; malicious prosecution; "malicious, willful, wanton, reckless conduct;" and "defamation/libel/slander/ and defamation per se." (*Id.*)

On July 30, 2018, Defendants City of Akron, Pasko, Brewer, McDonald, Pasternak, Guilmette, Talcott and Rybka (hereinafter referred to as "Defendants") removed the action to this Court on the basis of federal question jurisdiction. (Doc. No. 1.) Defendants thereafter filed an Answer on August 6, 2018. (Doc. No. 4.)

A Case Management Conference ("CMC") was conducted by then-assigned District Judge Sara Lioi on September 19, 2018, at which time various case management deadlines were set. (Doc. No. 9.) This matter was thereafter transferred to the undersigned on June 26, 2019 pursuant to General Order 2019-13. On July 11, 2019, the undersigned granted Defendants' Motion to extend the dispositive motion deadline until August 16, 2019. The dispositive motion deadline was later extended again to August 26, 2019.

On August 26, 2019, Defendants filed a Motion for Summary Judgment. (Doc. No. 30.) Plaintiffs filed a Brief in Opposition, to which Defendants responded. [3] (Doc. Nos. 36, 38.)

---

[2] On August 12, 2019, Defendants Calvaruso and Phillips filed a Motion to Dismiss pursuant to Fed. Rules of Civ. P. 12(b)(2) and (4), and 4(m) for Failure to Perfect Service. (Doc. No. 21.) Plaintiffs did not oppose the motion. This Court granted Defendants Calvaruso and Phillips' Motion on March 13, 2020 and dismissed both Defendants without prejudice. (Doc. No. 40.)

[3] In addition, on September 6, 2019, Defendants filed a Motion for Discovery Sanctions, on the grounds that Plaintiffs had failed to timely respond to Defendants' interrogatories and requests for production of documents. (Doc. No. 32.) Plaintiffs filed a Brief in Opposition, in which they argued Defendants' Motion should be denied (1) for failure to comply with Judge Lioi's CMC Scheduling Order; and (2) as untimely under Local Rule 37.1(b). (Doc. No. 34.) On March 13, 2020, the Court issued a Memorandum Opinion & Order denying Defendants' Motion. (Doc. No. 40.)

## II.     Facts

In April 2016, Plaintiff sold a bar located at 627 Arlington Avenue in Akron, Ohio.  (Affidavit of Joseph Salem (Doc. No. 36-2) at ¶ 1.)  Under the terms of the purchase agreement, Plaintiff maintained the liquor permit for this bar until certain conditions of the contract were met.  (*Id.*)  Plaintiff states that he did not, however, maintain any control over the bar's daily operations.  (*Id.* at ¶ 2.)  The new owners of the bar renamed it "Mango's Nightclub" (hereinafter "Mango's").  (*Id.*)

In the early morning hours of Saturday, June 25, 2016, Akron police officers reported to a call of an active fight at Mango's.[4]  (Affidavit of Terry Pasko (Doc. No. 30-1) at ¶ 9.)  When police arrived, patrons interfered with the arrest of a suspect and threw drinks at officers.  (*Id.*)  One suspect expelled an officer's OC (or pepper) spray on two officers, while another officer was struck in the head.  (*Id.*)  Numerous criminal charges resulted from the incident.  (*Id.*)  *See also* Doc. No. 41-1.  Plaintiff was not at Mango's on June 25, 2016 and avers that he "had no role or participation in the unfortunate melee that took place that evening."  (Salem Aff. at ¶ 4.)

Later that same day, in the early evening hours, Defendant Pasko received a telephone call from Akron Police Major Paul Calvaruso.  (Pasko Aff. at ¶ 9.)  According to Defendant Pasko, Calvaruso informed him that he had secured patrol officers for the night shift and asked if Pasko was available to come in and conduct bar administrative inspections.[5]  (*Id.*)  During this call, Defendant

---

[4]  The police report relating to this incident indicates that officers arrived just after midnight on June 25, 2016.  (Doc. No. 41-1 at PageID# 719.)

[5]  Pasko avers that he was assigned to the Akron Police Department Vice Unit as the commander in April 2007.  In this role, he met with Ohio Investigative Unit Supervisors and personnel to review the City of Akron municipal code sections pertaining to alcohol, prostitution, and gambling.  As Commander of the Vice Unit, Pasko states that he conducted administrative inspections of bars during permit hours and afterhours locations.  The Vice Unit was disbanded in 2012.  Pasko then became Commander of the Street Narcotics Unit.  However, he states that he continued to handle Vice complaints and investigations, and liquor permit background checks.  Pasko states that he also supervised bar inspections relating to complaints and conducting backgrounds on any liquor permit sale, transfer, or renewal, or new permit purchase.

Pasko and Calvaruso discussed the events earlier that morning at Mango's. (*Id.*) Pasko states that "Calvaruso wanted to conduct an inspection of Mango's and other select bars, and asked my opinion for other locations with a history of similar complaints or police activity." (*Id.* at ¶ 10.) Pasko discussed with Calvaruso "concerns raised by City councilpersons about growing problems at several bars." (*Id.*) Calvaruso selected the following four bars for inspections: (1) Mango's; (2) El Camaleon, located at 1079 South Arlington Street; (3) Hibachi Xpress Bar and Grille, located at 935 Brown Street; and (4) Club 631, located at 627 North Howard Street. (*Id.*) Plaintiff is the owner of one of these bars, i.e. the Hibachi Xpress Bar and Grille. (Salem Aff. at ¶ 5.)

That evening, during roll call, Defendant Pasko met with Calvaruso, Defendant Brewer, and a group of patrol officers assigned to assist in the bar inspections (hereinafter referred to collectively as "the police unit"). (Pasko Aff. at ¶ 11.) Among others, this group of patrol officers included Defendants McDonald, Pasternak, Guilmette, Rybka and Talcott. *See* McDonald Depo. (Doc. No. 25) at pp. 12-14; Pasternak Depo. (Doc. No. 29) at pp. 13-16; Guilmette Depo. (Doc. No. 26) at pp. 7-8; Rybka Depo. (Doc. No. 27 at pp. 5-6; Talcott Depo. (Doc. No. 28) at pp. 11. During this roll call meeting, Pasko discussed the locations of the bars to be inspected and briefed the officers on "what to look for." *See* Pasko Aff. at ¶ 11; McDonald Depo. at pp. 24-25; Pasternak Depo. at p. 16; Talcott Depo. at p. 11.

The police unit first went to Mango's; however, it was closed. (Pasko Aff. at ¶ 12.) The unit then proceeded to El Camaleon and conducted an inspection. (*Id.* at ¶ 13.) At that location, the bar

---

Pasko avers that, after the Vice Unit was disbanded, all liquor permit administrative inspections that he has conducted have been with the assistance of "borrowed uniformed patrol officers." *See* Pasko Aff. at ¶¶ 2-8.

manager was cited for failure to display a liquor permit and not displaying a liquor age warning sign. (*Id*.) In addition, an underage customer was charged. (*Id*.)

The police unit then proceeded to Plaintiff's bar, the Hibachi Xpress. (Pasko Aff. at ¶ 14.) It is undisputed that Defendants did not have a warrant to enter and/or search the premises. According to Plaintiff, police officers "barged in all at once and began yelling at me, employees, and patrons." (Salem Aff. at ¶ 7.) He avers that "it was a complete shock and disruption to what was otherwise an uneventful night." (*Id*.)

The parties agree that Defendant Pasko proceeded to the bar office located at the rear of the premises. (Pasko Aff. at ¶ 14; Salem Aff. at ¶ 8.) In his affidavit, Plaintiff avers that Pasko "began opening drawers and rummaging through my desk, file cabinets, personal effects, papers on and in my desk, and a Huntington Bank bag containing my personal information." (Salem Aff. at ¶ 10.) Defendant Pasko states that he was permitted to search this area of the bar in order to locate and examine operational records of the business, including documented keg taps, hose cleanings, and purchase orders. (Pasko Aff. at ¶ 14.) He alleges that, during the course of his inspection, he did not see a liquor age warning sign displayed prominently as required by City ordinance. (*Id*.) Plaintiff flatly denies this, alleging that "all required permits were properly displayed at Hibachi Xpress." (Salem Aff. at ¶ 18.)

Pasko avers that Plaintiff "was present in and around the bar office" during the inspection. (Pasko Aff. at ¶ 15.) Both parties agree that Plaintiff objected to the police unit's entry into the Hibachi Xpress and to Pasko's search of the bar office. (Salem Aff. at ¶¶ 11, 12; Pasko Aff. at ¶ 15.) According to Plaintiff, Pasko told him that the Akron Police were conducting a raid of Hibachi Xpress "based on what occurred the night before at Mango's Nightclub." (Salem Aff. at ¶ 13.) Specifically,

Plaintiff alleges that Pasko "made reference to the fact that he wasn't going to put up with my customers who were 'like a bunch of animals,' or words to that effect, and that this raid was the City of Akron Police's direct response to the incident at Mango's just the night before." (*Id.* at ¶ 14.) Plaintiff states that he told Pasko that he did not own Mango's; had no control over Mango's; was not present at Mango's the previous evening; and had no involvement of any kind with the incident at Mango's. (*Id.* at ¶ 15.)

The parties disagree about what happened next. Defendant Pasko avers that Plaintiff interrupted his inspection of the bar office "several times," and "drew his attention away from the inspection." (Pasko Aff. at ¶ 15.) Specifically, Pasko states that he "felt that Salem's verbal objections and physical presence was interfering with my ability to perform the inspection." (*Id.*) Plaintiff avers that he was not doing anything illegal and, further, that "at no time did my questions or objections prevent, delay, or impede Capt. Pasco [sic] from his activities." (Salem Aff. at ¶¶ 21, 22.)

Defendant Pasko ordered Defendant McDonald "to keep Mr. Salem from entering the office area and interrupting me." (Pasko Aff. at ¶ 15.) He further instructed McDonald that Plaintiff could be arrested "if his actions continued." (*Id.*) Pasko alleges that "when Mr. Salem persisted with his interference, I instructed Officer McDonald to arrest him." (*Id.*) He states that he "believed that Mr. Salem's [sic] displayed uncooperative behavior and purposely interrupted, hampered, obstructed, and delayed my performance of a lawful inspection." (*Id.*)

Defendant McDonld proceeded to arrest Plaintiff Salem. Plaintiff alleges that "during the course of my physical arrest, Sgt. McDonald grabbed my right wrist, twisted it, and forcefully pulled up on it." (Salem Aff. at ¶ 24.) He alleges that McDonald handcuffed him tightly and threw him to

the ground.[6] (*Id*. at ¶¶ 24, 26, 29.)  According to Plaintiff, he did not resist or make any threatening physical movements or verbal threats during his arrest.[7] (*Id*. ¶¶ 25, 27.)  Plaintiff also avers that he told McDonald that he (Plaintiff) had a heart condition and recently had coronary artery bypass surgery. (*Id*. at ¶ 26.)

Plaintiff alleges that he was nonetheless "lifted to [his] feet" and escorted out of the bar by Defendant McDonald. (*Id*. at ¶ 28.)  He claims that McDonald grabbed his right thumb and wrenched it upward and at an angle "so as to cause physical pain and harm." (*Id*. at ¶ 28.)  Plaintiff also alleges that he complained about his handcuffs, but they were not loosened. (*Id*. at ¶ 29.)

Plaintiff claims that, as he was being escorted out of the bar, he told Defendant McDonald that he had a CCW license and a handgun holstered and on his person. (*Id*. at ¶ 30.)  Defendant McDonald testified differently, stating that Plaintiff did not advise him about either the gun or the CCW license. (McDonald Depo. at Tr. 34, 48.)  McDonald stated that he became aware of the gun and the CCW license after Plaintiff was handcuffed, although he could not recall whether he saw the gun himself or another officer brought it to his attention. (*Id*. at Tr. 39-40.)

Plaintiff was then placed in a police vehicle for approximately 15 to 20 minutes. (Salem Aff. at ¶ 31.)  He alleges that he again asked that his handcuffs be loosened but the officers refused. (*Id*.)  Plaintiff alleges that, at some point, he was taken out of the cruiser and an older Akron police officer

---

[6] The Court notes that, in discovery, Plaintiffs produced surveillance video footage from several cameras in the Hibachi Xpress.  Defendants provided the Court with a CD of "trimmed" video footage from these cameras in support of their Motion for Summary Judgment. *See* Doc. No. 30-2.  While several cameras captured Plaintiff Salem's arrest, Plaintiffs do not direct this Court's attention to any portion of this footage that shows Salem on the ground or being thrown to the ground while he was inside the bar.  Defendant McDonald testified that Salem did not "go to the ground" during his arrest and did not indicate that he had been injured. (McDonald Depo. at Tr. 35.)

[7] Defendant McDonald testified that, while he was handcuffing Salem, Salem started pulling his right hand away and down towards his waistband, making it more difficult for McDonald to cuff him. (McDonald Depo. at Tr. 33-34.)

spoke to him and "explained why [his] restaurant was being raided." (*Id*. at ¶ 32.) Plaintiff claims this unidentified officer told him that "the raid on the Hibachi Xpress was based on the fact that the Akron Police were not going to tolerate 'their guys' getting hurt in '[Plaintiff's] bars.'" (*Id*.) Plaintiff states that he was then put back in the cruiser for another 15 to 20 minutes.[8] (*Id*. at ¶ 34.)

Plaintiff was later released and given a citation for carrying a concealed weapon, obstructing official business, failing to display a permit, and failing to have an age-instructive sign regarding underage drinking. (Salem Aff. at ¶ 35.) *See also* Doc. No. 30-3 at PageID#467. The parties agree that the case against Plaintiff was terminated on August 24, 2016 but dispute how the charges were resolved. Plaintiff argues that he did not enter into a plea agreement and that all charges were dropped "because there was no evidence to support any of the charges." (Salem Aff. at ¶¶ 37-40.) Defendants allege that the case was terminated by way of Plaintiff's acceptance of the Akron Prosecutor's Ohio Crim. R. 11 plea offer. (Morgan Aff. (Doc. No. 30-3) at ¶ 4.) *See also* Doc. No. 30-3 at PageID# 471. Specifically, Defendants claim that the Akron Prosecutor voluntarily dismissed the four charges against Plaintiff without prejudice in exchange for Plaintiff becoming compliant with the State of Ohio liquor laws by properly displaying all relevant permits and warnings. (*Id*.)

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir.

---

[8] After leaving the Hibachi Xpress, the police unit proceeded to Club 631, located at 627 North Howard Street. (Pasko Aff. at ¶ 18.) The officers conducted an inspection at that location, after first arresting the bouncer for denying entry. (*Id*.)

2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

### A.      Federal Claim—Unlawful Entry (Count III)[9]

In Count III of the Complaint, Plaintiffs allege a claim for unlawful entry under 42 U.S.C. § 1983.  (Doc. No. 1-1 at ¶¶ 62-65.)  Specifically, Plaintiffs allege that the "entry upon Mr. Salem's business was warrantless, unconsented, and without a lawful purpose and was otherwise unlawful." (*Id.* at ¶ 63.)  They further allege that "the raid upon Mr. Salem's business was to serve a purpose other than one supported by probable cause and was therefore unlawful."  (*Id.* at ¶ 64.)  Plaintiffs allege that, "as a direct and proximate result of the unlawful entry by the Defendants, [Plaintiffs] incurred attorney's fees, costs, inconvenience, and other damages."  (*Id.* at ¶ 65.)

Defendants argue that they are entitled to qualified immunity with respect to this claim.  (Doc. No. 30 at pp. 5-11.)  They maintain that, as liquor permit holders, Plaintiffs have a "greatly reduced" expectation of privacy in the Hibachi Xpress premises.  (*Id.*)  Citing Ohio regulations authorizing warrantless administrative inspections of liquor permit premises, Defendants maintain that Plaintiffs cannot demonstrate a violation of a federal constitutional right because Defendants were not required to have either reasonable suspicion or probable cause of any liquor code violations to enter the Hibachi Xpress.  (*Id.*)  Defendants further argue that no such right was clearly established at the time of the inspection at issue because "no case exists finding that an officer's entry into a liquor establishment to conduct an administrative inspection of a liquor permit premises pursuant to Ohio

_____

[9] While the Complaint states generally that "this action is brought pursuant to the United States federal laws, the laws of the United States Constitution, and the laws of the State of Ohio," the Complaint does not clearly identify which of Plaintiffs' seven claims are asserted as federal claims.  (Doc. No. 1 at ¶ 19.)  In their Motion for Summary Judgment, Defendants treat Plaintiffs' unlawful entry claim (Count III) as a federal claim under 42 U.S.C. § 1983, and the remaining claims (Counts I, II, IV-VII) as asserted solely under state law.  (Doc. No. 30.)  Plaintiffs do not object to this characterization or otherwise assert that any claim other than Count III is pled as a federal claim.  (Doc. No. 36.)  Indeed, with regards to Counts I, II, IV- VII, Plaintiffs cite solely to the state law elements of these claims and rely on state statutes and case law in support of their arguments.  (*Id.*)  Thus, the Court will treat Plaintiffs' unlawful entry claim as set forth in Count III as the only federal claim asserted in the Complaint.

Admin. Code 4301:1-1-79 under the particularized facts herein was a violation of the Fourth Amendment." (*Id*. at p. 10.)

Plaintiffs argue that, regardless of the fact that the Hibachi Xpress is a liquor permit premises, the warrantless inspection of an establishment is controlled by the restrictions of the Fourth Amendment. (Doc. No. 36-1 at p. 7.) Plaintiffs assert that "where officials conduct an administrative inspection based solely on improper motives, including but not limited to criminal suspicion, the search is invalid from its inception." (*Id.* at p. 9.) Plaintiffs argue that, herein, "Defendants were not conducting an administrative inspection of a liquor establishment" but instead "were showing Mr. Salem that they were not going to take an assault of one of their fellow officers lying down." (*Id.*) They maintain that the inspection was "nothing more than retaliation and bullying" and "at no time did the Defendants define the scope or legitimate purpose of their search and they did not articulate any illegal activity which would have otherwise prompted an entry and search." (*Id.* at pp. 9-10.) Plaintiffs further argue that "a reasonable officer would have known that conducting an administrative inspection with the purpose of sending a message of retaliation to Mr. Salem or his customers was impermissible under the Fourth Amendment." (*Id.*)

In their Reply, Defendants first assert that this Court should not consider Plaintiffs' arguments with respect to an allegedly unlawful *search* of the Hibachi Xpress because such a claim was not pled in the Complaint. (Doc. No. 38 at p. 3, 5.) With regard to Plaintiffs' unlawful *entry* claim, Defendants argue that there is no record evidence to support Plaintiffs' assertion of an improper motive. (Doc. No. 38.) Specifically, Defendants maintain that "Salem does not point to any competent and credible evidence to establish that Major Calvaruso singled out Hibachi Xpress for some ulterior purpose." (*Id*. at p. 4.) In this regard, Defendants note that Defendant Pasko identified four bars for inspection

based on their history of complaints, only one of which was owned by Plaintiffs. (*Id.*) Defendants further assert that, under Sixth Circuit precedent, "it is irrelevant whether an officer's true motivation was to pursue criminal charges or for some other purpose." (*Id.* at p. 5) (citing *Hamilton v. Lokuta*, 9 F.3d 1548, 1993 WL 460784 (6th Cir. 1993)).

Finally, Defendants argue that "clearly established law did not put the officers on notice that conducting a liquor inspection pursuant to O.R.C. § 4301.10 and O.A.C. 4301:1-1-79 under the record facts herein violated Salem's Fourth Amendment rights." (*Id.* at p. 10.) They maintain that, regardless of any alleged subjective motives, the record evidence in this case demonstrates that the Defendants were objectively reasonable in conducting the liquor inspection at issue for the purpose of ensuring that Hibachi Xpress and other liquor establishments in the City of Akron were complying with the liquor code. (*Id.*)

Qualified immunity shields law enforcement officers from civil liability unless the officers (1) violated a statutory or constitutional right and (2) the unlawfulness of their conduct was clearly established at the time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). These steps may be addressed in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018). With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his conduct. *Wesby*, 138 S. Ct. at 589. As the Supreme Court recently explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the

rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034.

*Wesby,* 138 S.Ct at 589-590.

Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, "we must examine the particular situation that [the defendant officers] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous et al.*, --- F.3d ----, 2020 WL 1284959 at * 3 (6th Cir. March 18, 2020). In the Fourth Amendment context, the Supreme Court has stressed "the need to identify a case where an officer acting under similar circumstances" was found to have violated that Amendment. *Wesby,* 138 S. Ct. at 590. "Without such a case, the plaintiff will almost always lose." *Howse,* 2020 WL 1284959 at * 3.

Here, Plaintiffs assert a Section 1983 claim for unlawful entry under the Fourth Amendment.[10] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses,

---

[10] To maintain a claim under Section 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374

papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This Amendment places two principal constraints on the government prior to authorizing any search or seizure: (1) a warrant written with particularity and specificity, and (2) probable cause that the object of the search is within the premises. *See Amvets Post No. 711 v. Rutter*, 863 F.Supp.2d 670, 673 (N.D. Ohio 2012). This is true for private residences, *Camara v. Municipal Court of City and Cty. of San Francisco*, 387 U.S. 523, 534 (1967), as well as commercial premises. *See v. City of Seattle*, 387 U.S. 541, 545 (1967).

However, the Supreme Court has held that when the business at issue is "closely or pervasively regulated," legislative schemes that provide for warrantless administrative inspections can be permissible. *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 76 (1970) (upholding a warrantless inspection pursuant to liquor regulations); *U.S. v. Biswell*, 406 U.S. 311, 315 (1972) (upholding a warrantless inspection of a licensed firearm dealer). The Court explained that an "owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy." *New York v. Burger*, 482 U.S. 691, 702 (1987). Thus, "where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.*

It is well-established that the liquor industry is highly regulated and that liquor permit holders, such as Plaintiffs herein, have a reduced expectation of privacy. *See, e.g., Colonnade,* 397 U.S. at

---

(6th Cir. 1991). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker,* 443 U.S. at 140.

76; *Russo v. Massullo*, 1991 WL 27420 at *4 (6th Cir.1991); *Amvets Post No. 711*, 863 F.Supp.2d at 674. *See also AL Post 763 v. Ohio Liquor Control Comm.,* 694 N.E.2d 905, 908 (Ohio 1998) ("The reasonable expectation of privacy in liquor permit premises is minimal because permit holders, regardless of permit class, consent to inspection of the premises by authorized agents through the provisions of the Liquor Control Act and accompanying administrative rules and regulations."); *Tyndle Ridge Development, LLC v. City of Cincinnati*, 2009 WL 2901539 at * 2 (S.D. Ohio Sept. 1, 2009) (same).

In Ohio, warrantless administrative inspections of liquor permit premises are authorized as follows:

> Warrantless administrative inspections may be conducted by authorized agents or employees of the division of liquor control, the department of public safety, or peace officers as defined in section 2935.01 of the Revised Code subject to the following limitations as to time, place, and scope:
>
> (A) Inspections shall be conducted for the limited purpose of determining compliance with the provisions of the liquor control act and the rules of the liquor control commission or the division of liquor control.
>
> (B) Inspections may be conducted only during those hours in which the permit holder is open for business and only by authorized agents of the division of liquor control, the department of public safety, or by any peace officer, as this term is defined in section 2935.01 of the Revised Code. ***
>
> (C) Inspections shall be conducted on that portion of the premises that is included as part of the licensed premises. The licensed premises shall be determined by the most current sketch of the premises on file with the division of liquor control. ***
>
> (D) This provision for warrantless administrative inspections includes, but is not limited to, the search and seizure of materials in locked closets, filing cabinets, cellars, attics, storage rooms, desks, and safes located on the licensed premises, so long as there is reasonable suspicion that evidence of violation of the liquor control act, the rules of the liquor control commission, or the rules of the division of liquor control will be found therein. Such materials shall include books and records, wherever they may be found on the premises. Nothing in this rule shall be construed to contravene the plain view doctrine. *** It shall be within the discretion of the liquor control

commission or any court of competent jurisdiction to determine whether the right to inspect was based on reasonable suspicion that evidence of violations of the liquor control act, rules of the liquor control commission, or division of liquor control would be found in said licensed premises.

Ohio Admin. Code § 4301:1-1-79.[11]  Construing this provision, the Ohio Supreme Court has held that "the administrative rule does not require agents to possess a reasonable suspicion of a violation to enter liquor permit premises and conduct routine inspections, pursuant to Ohio Admin. Code 4301:1-1-79(A)-(CC), of those items in plain view." *AL Post 763*, 694 N.E.2d at 909.

For the following reasons, the Court finds that Plaintiffs have failed to demonstrate that the Defendant Officers violated a clearly established constitutional right when they entered the Hibachi Xpress without a warrant on June 25, 2016.  As noted above, warrantless administrative inspections of liquor permit premises are authorized under Ohio Admin. Code § 4301:1-1-79.  Plaintiffs do not dispute that, consistent with this regulation, the Defendant Officers entered the Hibachi Xpress during business hours and limited their inspection to the licensed premises, as set forth in the permit sketch of Hibachi Xpress on file with Ohio's division of liquor control.  Defendants assert (and Plaintiffs do not dispute) that this sketch includes the bar office area that Defendant Pasko entered as part of the inspection.  *See* Pasko Aff. at ¶ 14; Doc. No. 30-1 at PageID# 452-457.  Moreover, Plaintiffs do not

---

[11] Nonetheless, warrantless inspections of commercial establishments in closely regulated industries (such as liquor permit premises) must meet three criteria in order to be deemed reasonable within the meaning of the Constitution. *See Hamilton*, 1993 WL 460784 at * 2.  *See also Liberty Coins LLC v. Goodman*, 880 F.3d 274, 281 (6th Cir. 2018).  Specifically, and as delineated by the Supreme Court in *New York v. Burger, supra*, in order to be deemed reasonable, and thus constitutional, under the Fourth Amendment: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702–03 (internal quotations omitted; brackets removed) (the "*Burger* test").  Here, Plaintiffs do not allege (or argue) that Ohio's statutory and regulatory provisions relating to warrantless administrative inspections of liquor permit premises are facially unconstitutional.  Thus, the Court does not address that issue under the *Burger* test, herein.

argue that the inspection was excessively long, nor does Plaintiff Salem assert any claim that he was unlawfully detained or seized during the inspection.

Plaintiffs do, however, argue that Defendants are not entitled to qualified immunity because the actual motivation for the warrantless inspection of the Hibachi Xpress was improper and retaliatory in nature. In this regard, Plaintiffs point to the deposition testimony of Defendants McDonald, Pasternak, and Brewer, each of whom testified that the bar inspections conducted on June 25, 2016 were related to the incident at Mango's the night before. (Doc. No. 36-1 at p. 10.) Specifically, the record reflects that Defendant McDonald testified as follows:

> Q: Sergeant, you had indicated that there was a discussion about doing some bar inspections at roll call, shortly after roll call, on June 25, 2016. Can you tell me anything else that you recall in terms of, you know, what was discussed relative to performing these bar inspections or these raids?
>
> A: I think they just had said that there was some recent – there was a lot of acts of violence that were going on around the bars and things like that. So we wanted to make sure that the patrons knew that, and the bar owners and managers and workers knew that we were present and trying to keep the city safe for anybody that was going into these bars.
>
> ***
>
> Q: Okay. So was what happened at Mango's part of like the roll call briefing, prior to going out and doing these?
>
> A: It was brought up. I want to say that they basically talked about that and said – that's kind of what I was saying – that we had to make sure that the bars, that they knew we were trying to keep the bars safe. Because if they're going to— I think they had said something along the lines of, if they're going to throw a beer bottle at a uniformed police officer and hurt them, then who knows what they would do to the citizens.
>
> ***
>
> Q: …. And so, Sergeant, is it fair to say that if the Department is pulling guys from other zones to do these bar raids, that this is, in part, a response to a police officer getting hit on the head the night before with a liquor bottle or a beer

bottle?  Like this is the police kind of like coming back and sending a message on some level.  Is that fair?

COUNSEL:    Objection. You can answer.

A:    I wouldn't say it's sending—I don't know how – if I would word it in those words.  It was more like I said a little bit ago, if they're going to throw beer bottles at police officers in uniform, how safe is anybody really at these bars.  So it was more like, let's get out and show them that we're there and present, and make sure they're following the rules at the bars.

(McDonald Depo. at Tr. 12, 13-14, 16-17.)  Defendant Pasternak testified that it was his understanding that the inspections were a "response to, you know, the bars that we have been having problems with in the past."  (Pasternak Depo. at Tr. 29.)  Lastly, Defendant Brewer testified that he "assumed" that the decision to do a bar check at Mango's was made as a result of the incident that had occurred there.  (Brewer Depo. at Tr. 31.)

The Court finds Plaintiffs' argument to be without merit for several reasons. As an initial matter, even construing all factual inferences in Plaintiffs' favor, the Court is not convinced that the above deposition testimony demonstrates a retaliatory or improper motive.  While these Defendants each acknowledged that the Mango's incident prompted the inspections, none of them testified that the inspections were "retaliation" for that incident or for the purpose of punishing Plaintiffs.  Rather, the officers testified that the purposes of the inspections were (1) to provide a police presence at bars where there had been problems with violence, and (2) ensure that "they're following the rules at bars."  (McDonald Depo. at Tr. 12, 13-14, 16-17.)  It is true that Defendant McDonald testified that the Mango's incident heightened concerns about violence and citizen safety and contributed to the decision to conduct the inspection.  However, neither Defendant McDonald, Pasternak, or Brewer

testified that the June 25, 2016 bar inspections were retaliatory or designed to punish bar owners.[12]

Plaintiffs have not directed this Court's attention to any other deposition testimony or documentary

evidence that they claim shows such retaliatory or otherwise improper intent.[13]

Moreover, even assuming *arguendo* that Plaintiffs had come forward with sufficient evidence

to create a genuine issue of material fact as to whether the Defendant Officers' actual motive was to

find evidence of criminal activity or to otherwise punish Plaintiffs, this does not necessarily translate

into a finding of a constitutional violation. In *Burger, supra*, the Supreme Court noted that "[s]o long

as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the

inspecting officer has the power to arrest individuals for violations other than those created by the

scheme itself." *Burger*, 482 U.S. at 717. Indeed, the Supreme Court explained that "an administrative

scheme may have the same ultimate purpose as penal laws, even if its regulatory goals are narrower."

*Id*. at 713. As one Circuit Court of Appeals has explained, "[t]here can be little doubt, therefore, that

an administrative search statute may serve a criminal law purpose as well as an administrative one."

*United States v. Johnson*, 408 F.3d 1313, 1321 (10th Cir. 2005). *See also Burger*, 482 U.S. at 716

---

[12] Plaintiffs also note Defendant Brewer's testimony that "certain businesses that we've run into bring in a clientele where violence tends to be part of their culture." (Brewer Depo. at Tr. 51.) He stated that "in that case, I would say that the bar owner or establishment owner, if it's not a bar, would have some responsibility for the type of clientele that they are trying to bring in." (*Id*. at Tr. 52.) While Plaintiffs state generally that this testimony "introduces a racial and/or socio-economic dynamic to the City of Akron Police's conduct," they do not expressly argue that the June 25, 2016 inspection of the Hibachi Xpress was motivated by an improper racial or socio-economic motive. (Doc. No. 36-1 at p. 11.) Thus, the Court does not address that issue herein.

[13] Plaintiff Salem avers in an affidavit that an unidentified, older Akron police officer "indicated that the raid on Hibachi Xpress was based on the fact that the Akron Police were not going to tolerate 'their guys' getting hurt in 'my bars.'" (Salem Aff. at ¶ 32.) Although Plaintiffs had a full opportunity to conduct discovery, Plaintiffs do not identify this "older Akron police officer" and apparently did not take his deposition. Plaintiffs do not rely on this alleged statement by the unidentified Akron police officer in the legal argument section of their Brief in Opposition, and cite no authority indicating that Plaintiff Salem's affidavit detailing this alleged statement by an unidentified police officer, is sufficient to create a genuine issue of material fact regarding the issue of retaliatory motive.

19

("Nor do we think that this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes.")

Based on this principle, federal courts have held that there is nothing inherently unconstitutional in conducting a warrantless administrative inspection where the officers possess some degree of suspicion of criminal activity. *See e.g., United States v. Villamonte–Marquez*, 462 U.S. 579, 584 n. 3 (1983) (upholding administrative search of ship following an informant's tip that a vessel was carrying marijuana and noting that there was "little logic in sanctioning ... examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers" ) (internal quotations omitted); *Rodriguez v. City of Cleveland*, 439 Fed. Appx. 433, 445-447 (6th Cir. 2011) ("The individual defendants' pre-search suspicion that Rodriguez possessed a stolen dump truck did not render their warrantless administrative search of M & M [Towing] invalid.") (citing cases); *United States v. Thomas*, 973 F.2d 1152, 1155-1156 (5th Cir. 1992) ("Administrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing."); *Johnson*, 408 F.3d at 1321.

Thus, in the instant case, even if the June 25, 2016 inspection was motivated by a generalized suspicion of criminal activity, that does not necessarily invalidate the inspection of the Hibachi Xpress or otherwise defeat qualified immunity. *See e.g., Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") Indeed, the Sixth Circuit rejected a similar argument in *Hamilton v. Lokuta*, 1993 WL 460784 (6th Cir. Nov. 9, 1993). In that case, the plaintiff bar owner argued that the "true motivations" behind the defendant officer's

warrantless administrative search was to gather evidence of criminal activity and/or to put the plaintiff out of business. *Id.* at *3. The Sixth Circuit nonetheless upheld qualified immunity with respect to the defendant's search of the premises, explaining as follows:

> The fact that the true motivation for the warrantless search may have been to gather evidence capable of supporting convictions under the criminal laws is not enough to make the search unreasonable. *Burger*, 482 U.S. at 715. The presumed desire to put Mr. Hamilton out of business may or may not have been justified, but we do not believe that it could suffice to defeat Lt. Lokuta's qualified immunity defense. The test is objective, not subjective, and we think an objectively reasonable officer could well have believed that a search conducted as this one was would be lawful.

*Id.* at * 3.

In the instant case, even assuming that the motive behind the June 25, 2016 inspection was suspicion of criminal activity or to retaliate for the Mango's incident, the Court finds that an objectively reasonable officer faced with the particular circumstances presented herein could have believed that the warrantless entry of the Hibachi Xpress was lawful. Indeed, Plaintiffs do not direct this Court's attention to any clearly established law that holds otherwise. As noted above, to be "clearly established," a legal principle must have a sufficiently clear foundation in then-existing precedent. *Wesby*, 138 S.Ct. at 589. This precedent must be "dictated by controlling authority or a robust consensus of cases of persuasive authority" and, further, "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 589-590 (internal quotations and citations omitted). Here, for the following reasons, the Court finds that Plaintiffs have failed to identify any clearly established law that conducting a statutorily authorized warrantless administrative inspection of a liquor establishment under the particular circumstances presented herein (i.e., in response to concerns raised by a recent violent incident at such an establishment) is unlawful and in violation of the Fourth Amendment.

Plaintiffs cite a footnote in *Burger*, in which the majority states that, in that case, there was "no reason to believe that the instant inspection was actually a pretext for obtaining evidence of respondent's violation of the penal laws." *Burger*, 482 U.S. at n. 27. However, the fact that the Supreme Court noted, in passing, that the issue of pretext was not present in that case is not sufficient, standing alone, to constitute "clearly established law" that the warrantless inspection of the Hibachi Xpress under the particular circumstances presented herein, was unlawful. This is particularly the case in light of Supreme Court and Sixth Circuit authority upholding warrantless administrative inspections where the officers possessed some degree of suspicion of criminal activity. *See e.g., Villamonte–Marquez*, 462 U.S. at 584 n. 3 (upholding administrative search of ship following an informant's tip that a vessel was carrying marijuana); *Rodriguez*, 439 Fed. Appx. at 445-447 ("The individual defendants' pre-search suspicion that Rodriguez possessed a stolen dump truck did not render their warrantless administrative search of M & M [Towing] invalid.") (citing cases). *See also Thomas*, 973 F.2d at 1155-1156 ("Administrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing.")

Plaintiffs also cite *Anobile v. Pelligrino*, 303 F.3d 107 (2nd Cir. 2002) and *United States v. Johnson*, 408 F.3d 1313 (10th Cir. 2005) for the proposition that "*Burger* and its progeny make clear that where officials conduct an administrative inspection based solely on improper motives, including but not limited to criminal suspicion, the search is invalid from its inception." (Doc. No. 36-1 at p. 9.) The Court finds that these cases do not support Plaintiffs' argument. In *Anobile,* the Second Circuit found that warrantless administrative searches of employee dormitories at a racetrack were unconstitutional where the scope of the searches was broader than that provided in the regulations;

i.e., where the officers searched the dormitories not just for evidence of equine drugs and drug paraphernalia but also for "other dangerous items" such as guns or knives and "unauthorized persons being harbored illegally in the rooms." *Anobile*, 303 F.3d at 122-123. Notably, the court in that case upheld the constitutionality of the warrantless administrative searches of the racetrack, barn, and racetrack vehicles, despite the fact that the defendant "testified that the initial motivation for the search of the entire Yonkers Raceway resulted from information regarding prostitution and drug use." *Id*. [14] Moreover, even as to the searches of the employee dormitories, the court upheld the grant of qualified immunity to the defendant officers on the grounds that it was not clearly established law at the time that such dormitory searches were unlawful. *Id*. at 125-126.

In *Johnson*, the defendant officers decided to conduct a warrantless administrative search of a salvage yard because they had information that it "had employed one car thief, and we wanted to see if there were similar goings on in the business." *Johnson*, 408 F.3d at fn 1. The Tenth Circuit upheld the constitutionality of the search, explaining as follows: "[The defendant officers] had a vague suspicion that the kind of criminal activity the administrative scheme was directed towards detecting—car theft—had occurred or might be evident at the salvage yard where Johnson worked.

---

[14] In a string citation, Plaintiffs cite the Supreme Court's decision in *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447 (2000). In that case, the Supreme Court held unconstitutional an Indianapolis roadside checkpoint program whose primary purpose was narcotics detection, and this purpose was "ultimately indistinguishable from the general interest in crime control." *Edmond*, 121 S.Ct. at 458. The Supreme Court rejected the city's argument that the program was justified by its "lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations." *Id*. at 457. Because the city conceded that the primary purpose of the checkpoint program was narcotics detection, the Court expressed no view on "whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id*. at 457 n. 2. Additionally, the Supreme Court expressly cautioned that "the purpose inquiry in this context is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." *Id*. at 457. In the instant case, there is no allegation that the primary purpose of Ohio's liquor control regulations is anything other than detecting liquor violations. Moreover, the inspections in the instant case were, in fact, limited to searching for evidence of liquor related violations, such as failing to display permits and age-instructive signage. Notably, Plaintiffs herein do not allege that Defendants' inspection of the Hibachi Xpress included the unauthorized search for evidence of non-liquor related offenses.

There is nothing unconstitutional in embarking upon an administrative inspection with that degree of criminal suspicion." *Id*. at 1322. The court then rejected the district court's finding that the warrantless searches were pretextual, explaining as follows:

> Finally, we address Johnson's argument, with which the district court agreed, that the entire inspection was simply a pretext to seek evidence of criminal activity. We have previously acknowledged that an administrative inspection could be such a sham that it is "a pretext solely to gather evidence of criminal activity." *United States v. Johnson*, 994 F.2d 740, 742 (10th Cir.1993). We have also characterized the issue of "[w]hether an administrative search is a pretext for a criminal investigation" as "a factual question." *Id.* at 743. While there certainly are factual issues involved in such an inquiry, we conclude that the district court in this case committed two legal errors in determining that the administrative search in this case was a pretext solely to gather evidence of criminal activity.
>
> The first error was the court's implicit conclusion that an administrative inspection statutory scheme may never encompass a criminal law enforcement purpose. As we have explained, *supra,* an administrative inspection may encompass both an administrative and a criminal law enforcement purpose. Thus, the fact that the officers inspecting Autoplex Salvage had an objectively reasonable basis to suspect they might find stolen cars or car parts in their inspection does not invalidate that inspection. Second, we hold that the district court erred as a matter of law in summarily rejecting the officers' good-faith reliance on the constitutionality of the statutes as applied to this search. In fact, the district court appears to have turned the good-faith analysis on its head when it rejected its applicability "[g]iven the predominant purpose of this inspection/search." Order at 6 n. 13, Appellant's App. at 220. **The district court appears to have focused on the subjective motivations of the officers, suggesting their desire to find something illegal about Johnson rendered the entire search unlawful. Where officers are engaged in a proper administrative search, the officers' motive is irrelevant; what matters is whether their conduct was objectively reasonable**. *See Whren v. United States*, **517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (rejecting the idea that "an ulterior motive might serve to strip [officers] of their legal justification").[ footnote omitted]. We have held that it was.**

*Id*. at 1323 (emphasis added).

Plaintiffs do not sufficiently explain how either *Anobile* or *Johnson* support the conclusion that the inspection of the Hibachi Xpress under the particular circumstances presented was contrary to "clearly established law." Nor do Plaintiffs identify any other "clearly established law"

establishing that conducting a statutorily authorized warrantless administrative inspection of a liquor establishment in response to concerns raised by a recent violent incident at such an establishment, is unlawful and in violation of the Fourth Amendment. As the Sixth Circuit has explained, "[w]ithout such a case, the plaintiff will almost always lose." *Howse,* 2020 WL 1284959 at * 3.

Accordingly, and for all the reasons set forth above, the Court finds that the individual Defendants are entitled to qualified immunity with respect to Plaintiffs' unlawful entry claim set forth in Count III.

With respect to Plaintiffs' argument that the Defendants engaged in an unlawful *search* of Plaintiff Salem's bar office, the Court agrees with Defendants that this claim is not adequately pled in the Complaint.[15] As noted above, Count III of the Complaint is specifically pled as a claim for "unlawful entry" and alleges only that "the above described entry upon Mr. Salem's business was warrantless, unconsented, and without a lawful purpose or was otherwise unlawful." (Doc. No. 1-1 at ¶ 63.) The word "search" appears nowhere in the body of Count III, and the caption of the claim does not include the term "unlawful search." Accordingly, the Court finds Plaintiffs failed to plead a claim for unlawful search under § 1983.

Moreover, even if Plaintiffs had properly alleged a federal claim for unlawful search, the Court would find it without merit. In their Brief in Opposition, Plaintiffs do not differentiate between their unlawful entry and search claims and, instead, rely on the same argument in support of both; i.e., that the Defendant Officers' conduct violated the Fourth Amendment because they had an

---

[15] In their Reply Brief, Defendants expressly argue that Plaintiffs failed to plead a claim for unlawful search in the Complaint. (Doc. No. 38 at pp. 3, 5.) Plaintiffs did not seek leave to file a sur-reply and, thus, have not presented any argument to this Court that an unlawful search is sufficiently pled.

improper motive for entering and searching the Hibachi Xpress. This argument is rejected, however, for the reasons discussed at length above.

Therefore, and for all the reasons set forth above, Defendants are entitled to qualified immunity, and summary judgment in their favor, with respect to Plaintiffs' unlawful entry claim as set forth in Count III of the Complaint.[16]

**B.     State Claims (Counts I, II, IV-VII)**

The remainder of Plaintiffs' claims arise under Ohio law, and diversity is lacking in this case. A district court may decline to exercise supplemental jurisdiction over state law claims when the claims supporting original jurisdiction are dismissed. 28 U.S.C. § 1367(c)(3). While there is no categorical rule that the court is barred from exercising supplemental jurisdiction, the district court's decision to exercise supplemental jurisdiction depends on "judicial economy, convenience, fairness, and comity." *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir.2002) (citing *Musson Theatrical v. Federal Express*, 89 F.3d 1244, 1254 (6th Cir. 2002)). The Sixth Circuit has held that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc.*, 89 F.3d at 1255. *See also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir.2006) ("a federal court that has dismissed a plaintiff's federal claims should not ordinarily reach the plaintiff's state-law claims"); *Moss v. Mercy St. Anne Hospital*, 2014 WL 172530 at * 2 (N.D. Ohio Jan. 13, 2014).

---

[16] Plaintiffs do not assert a *Monell* claim against the Defendant City of Akron alleging that the Defendant Officers followed some City custom or policy in conducting liquor inspections that violated his constitutional rights.

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Plaintiffs do not dispute that Counts One, Two, Four, Five, Six, and Seven of the Complaint are plead as state law claims. Moreover, the parties' argument and briefing with respect to these claims depend heavily on the interpretation and application of state law authority. The parties have not articulated any reason why the Court should exercise supplemental jurisdiction over Plaintiffs' state law claims under these circumstances. Accordingly, and upon careful consideration, the Court determines that Plaintiffs' remaining state law claims should be adjudicated in state court.

The Court therefore declines to exercise supplemental jurisdiction over Plaintiffs' state law claims (i.e., Counts One, Two, Four, Five, Six, and Seven) and hereby remands said claims to the Summit County Court of Common Pleas.

## V.      Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 30) is GRANTED as to Plaintiffs' unlawful entry claim (Count III) brought under 42 U.S.C. § 1983. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and remands those claims to the Summit County Court of Common Pleas.

**IT IS SO ORDERED**


  *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  March 24, 2020                                   U. S. DISTRICT JUDGE